ABBYE EMPLOYMENT AGENCY, INC., Respondent, *v.* OLIVE ROBINSON, Appellant.

Supreme Court, Appellate Term, First Department, February 14, 1938.

*Allen Caruthers*, for the appellant.

*Saypol & Rock [Arthur M. Saypol* of counsel], for the respondent.

HAMMER, J. Plaintiff, a licensed employment agency, brought this action against the defendant, a seamstress, in the Municipal Court of the City of New York, First District, to recover an amount equal to one week's wages pursuant to a written agreement under which plaintiff procured employment for the defendant at eighteen dollars a week. The defendant paid seven dollars and twenty cents, or ten per cent of the compensation, on a monthly basis, as provided by law. The amount sued for is the balance of ten dollars and eighty cents. The answer was a general denial. The sole issue at the trial and the only question presented on this appeal is whether section 185 of the General Business Law is constitutional. The trial court decided for plaintiff, and in doing so held the

section invalid under the Federal Constitution. In so far as pertinent, the agreement between the parties provided that, in consideration of the agency accepting the application, the applicant agreed to pay the agency a placement commission of an amount equal to the first week's salary in three installments during the first three weeks provided the employment was not on a yearly contract, in which event the placement commission would be five per cent of the yearly income.

The questioned section, so far as applicable, reads as follows:

" § 185. Fees charged by persons conducting employment agencies. ·

" 1. The gross fees of licensed persons charged to applicants for employment as lumbermen, agricultural hands, coachmen, grooms, hostlers, seamstresses, cooks, waiters, waitresses, scrub-women, laundresses, maids, nurses (except professional) and all domestics and servants, unskilled workers and general laborers, shall not in any case exceed ten per centum of the first month's wages, and for all other applicants for employment, shall not exceed the amount of the first week's wages or salary unless the period of employment is for at least one year, and at a yearly salary, and in that event the gross fee charged shall not exceed five per centum of the first year's salary, except when the employment or engagement is of a temporary nature, not to exceed in any single contract one month, then the fee shall not exceed ten per centum of the salary paid."

If the provisions of the section can be upheld, the agreement, in so far as it charged more than the gross fees permitted, was invalid. The validity of the agreement in that respect was dependent upon the invalidity of the statute. The question to be determined is whether the due process clause of the Federal Constitution was contravened when the Legislature fixed the maximum fees provided in the section.

The New York statute is distinguishable in a material feature from that involved in the case of *Ribnik* v. *McBride* (277 U. S. 350), upon which the plaintiff and the court below relied in holding the section unconstitutional. There the Legislature had conferred upon the Commissioner of Labor the power to fix the charges of employment agents for services. Here the Legislature itself fixed the gross fees chargeable to applicants for employment in the enumerated occupations, which at a glance are seen to be common labor of a necessitous class. That statute may be said to have injected a stranger to the parties into their contract to decide what compensation for services the parties could agree upon. Our statute leaves the parties free to agree upon the compensation, but marks out the boundary between reasonable rate and extortion-

ate charge. Beyond the sphere of reasonable rate an agreement for compensation is in effect declared unenforcible.

We are mindful of the rule that the interpretation of the Federal Constitution by the United States Supreme Court is binding on State courts. (*People ex rel. Tipaldo* v. *Morehead*, 270 N. Y. 233; *Bourjois Sales Corp.* v. *Dorfman*, 273 id. 167.) We also have in mind the rule of the United States Supreme Court that the meaning fixed by the decision of the highest State court will be accepted as being specifically expressed in the statute. However, in the consideration by State courts of the validity under the Federal Constitution of a State statute substantially similar to the statute of another State, a contrary decision in respect of the latter by the Supreme Court of the United States is not necessarily controlling if it can be fairly demonstrated that the statute under consideration by the State courts is not identical or for other reasons should receive a different interpretation.

There has not been any decision called to our attention nor has our investigation discovered any in which any appellate court of our State in a considered opinion has held that section 185 was unconstitutional as a matter of first impression or as controlled by the *Ribnik* case. It appears also that, in view of the decision of the United States Supreme Court in *West Coast Hotel Co.* v. *Parrish* (300 U. S. 379), reconsideration may be had of constitutional questions decided in a prior case where the validity of the principles upon which that decision rests is challenged and the constitutional interpretation of a different statute is affected by the previous decisions. In the *West Coast Hotel Co.* case the validity of the principles upon which the decision in *Adkins* v. *Children's Hospital* (261 U. S. 525) rested was challenged. The *Adkins* case held invalid the District of Columbia Minimum Wage Act. The Minimum Wage Law of Washington attacked in the *West Coast Hotel Co.* case had been enacted prior to the decision in the *Adkins* case and had twice been held valid by the Supreme Court of that State. (*Larsen* v. *Rice*, 100 Wash. 642; 171 P. 1037; *Spokane Hotel Co.* v. *Younger*, 113 Wash. 359; 194 P. 595.) The Washington law was similar to that of Oregon (Oregon Laws of 1913, chap. 62), which was sustained by the Supreme Court of Oregon. (*Stettler* v. *O'Hara*, 69 Ore. 519; 139 P. 743; *Simpson* v. *O'Hara*, 70 Ore. 261; 141 P. 158.) The Oregon decisions were affirmed by the United States Supreme Court by a divided vote. (243 U. S. 629.) The Washington and Oregon statutes were enacted in 1913 and the District of Columbia statute in 1918. The District of Columbia law (40 Stat. 960), which was sustained by the Supreme Court of the District, was first affirmed by the Court of Appeals of the

District, but on a rehearing reversed by that court, and the reversal was sustained by the United States Supreme Court by a divided vote. The Washington statute was upheld by the State court as a reasonable exercise of the police power of the State. In its conclusion the State court refused to regard the decision in the *Adkins* case as determinative. It invoked principles established by other decisions and pointed to them as justifying its decision. It did this, although in 1925 and 1927 similar minimum wage statutes of Arizona and Arkansas were held invalid under authority of the *Adkins* case, and although the New York State Minimum Wage Law was held invalid in *Morehead* v. *New York ex rel. Tipaldo* (298 U. S. 587). In the *Morehead* case, however, the United States Supreme Court held " that the ' meaning of the statute ' as fixed by the decision of the State court ' must be accepted here as if the meaning had been specifically expressed in the enactment.' Id. p. 609." (*West Coast Hotel Co.* case, p. 389.) In the *West Coast Hotel Co.* case the Supreme Court held the position taken by the Washington State court required a reconsideration of the *Adkins* case, and, upon so doing, overruled that case and affirmed the judgment of the Supreme Court of Washington. The *Adkins* case and the reasons upon which it was decided were in a measure the basis of the decision in the case of *Ribnik* v. *McBride* (*supra*). As stated, we are of the opinion that the provisions of the New York statute are not identical with the provisions of that involved in the *Ribnik* case. In addition, the principles relied upon in the majority opinion there are challenged here and principles established by other cases are invoked. It is urged that, in so far as the New York statute is concerned, the *Ribnik* case is not controlling, but, if necessary, it may be reconsidered or limited to the precise facts there presented.

Guided by the authority of the *West Coast Hotel Co.* case and for the reasons expressed above, we feel that we are not controlled by the *Ribnik* case. In addition, we feel that the meaning of the statute should be determined on the merits by the New York courts. In our opinion this procedure was indicated by the *Morehead* and *Ribnik* cases.

We are of the conviction that the provisions of section 185, fixing maximum charges of employment agencies to applicants, do not violate the clause of the Fourteenth Amendment providing that no State shall deprive any person of property without due process of law. The regulation of employment agencies provided for in the State statute is undoubtedly valid and the validity of the statute for that purpose is conceded. The validity of the regulation of employment agencies was recognized in *Brazee* v. *Michigan* (241 U. S. 340); *Adams* v. *Tanner* (244 id. 590), and in the *Ribnik*

case, which stated: " That the State has power to require a license and regulate the business of an employment agent does not admit of doubt." The question here is whether the provisions of section 185 which fix minimum charges for services to applicants is invalid. It has been held that, unless the business is " affected with a public interest," the Constitution prohibits legislation fixing prices or charges for services and requires that same be left to the free agreement of the parties. (*Munn* v. *Illinois*, 94 U. S. 113; *Wolff Co.* v. *Industrial Court*, 262 id. 522; *Tyson & Bro.* v. *Banton*, 273 id. 418; the *Ribnik* case and others referred to therein.)

The Legislature, we are persuaded, in the enactment of the statute regulating employment agencies, did not act without reason or for reasons of expediency or in the exercise of an arbitrary power. We indulge the presumption that the Legislature at the time of the enactment had adequate knowledge of evils existing in the dealings between employment agencies and applicants for employment to require a license, the regulation of the business and the fixation of gross fees, particularly where the applicants were domestic servants, common laborers and similar working persons. There existed conditions peculiar to the business which affected it with a public interest and required the provisions enacted. Were such presumption denied, recourse is open to us, as it was to the Legislature, to a mass of information on the subject much of which is given in the minority opinion and footnotes in the *Ribnik* case.

A wealth of information is also contained in other cases, in many well-known works of reference, and in numerous official reports. Most of the practices and facts therein referred to were matters of public concern at the time of the enactment of the New York statute. Regulatory statutes had been passed in the United States as early as 1848. More than forty States have since enacted regulatory legislation. (*Adams* v. *Tanner*, *supra*, dissenting opinion of BRANDEIS, J., and footnotes; *Patterson* v. *Bark Eudora*, 190 U. S. 169; New York State Industrial Survey Comm. Report, N. Y. Legis. Doc. [1929] No. 75, pp. 29–44; 10 Ency. Americana, p. 304; 8 Ency. Britannica, p. 413; 5 Ency. of Social Sciences, pp. 518, 525.)

Unemployed working persons who are under the necessity of jobs to sustain themselves and their dependents are unable as a class to protect themselves against agencies offering jobs upon payment of unfair and unreasonable fees. There is no equality between the parties under the circumstances. One is in a position to exact, and necessity has deprived the other of any ability to resist. The seriousness of the problem and that the relations of the parties afford great opportunities for fraud and oppression has been recog-

nized by the courts of our State. (*People ex rel. Armstrong* v. *Warden*, 183 N. Y. 223, 227.)

Although there were other evils, the business was subject to the abuse of extortionate overcharges. The legislators regarded this as one of the principal reasons for regulation. The fee agreed upon in the very case considered here was the unconscionable sum of eighteen dollars, or one whole week's wages, the employment sought being the common labor of seamstress. A congressional report had indicated a fee of five dollars to sixteen dollars was regarded as exorbitant, and showed that as much as twenty-four dollars a year had been extorted from scrubwomen for obtaining employment. The practice of discriminatory fees had been in vogue. Fee-splitting and job-selling was prevalent. In times of widespread unemployment fees were raised to unconscionable amounts which no doubt is the reason for the excessive charge in the case before us. The appellant, being out of work, and undergoing physical deprivation and mental concern for self and dependents, had little or no ability to bargain for a price. In most instances she was required to pay the whole price for the services of the agency, although in large part they were rendered to the employer. Legislation for the correction of these evils has been enacted throughout the United States showing a nationwide recognition of the necessity, not alone for license and regulation, but for the fixation of maximum fees. Every possible presumption is in favor of the validity of the statute and the one asserting invalidity has the burden to show the law is unconstitutional. (*Erie R. R. Co.* v. *Williams*, 233 U. S. 685.)

Police power includes everything essential to the public safety, health and morals. (*Lawton* v. *Steele*, 152 U. S. 133.) The regulation of the liberty to contract by the maximum charges provided in section 185 we are convinced is reasonable in relation to the subject-matter of the statute. Maximum charges were a protection of the community against evils which menaced the health, safety and welfare of a large section of the people, and, no doubt in many instances, their morals. The regulations generally and in particular in respect of maximum charges were designed to insure freedom from oppression of those of a necessitous class in whom the State had a special interest, who were liable to be, and in fact were shown to be, overcharged and exploited by unscrupulous employment agents. In times of depression the public has a particular interest that the unemployed in seeking employment be not subjected to extortionate charges. Unparalleled demands for relief are made upon public funds. When a choice is open between accepting public relief or paying extortionate charges, many are likely to

go on public relief. Unfortunately, many others who are conscientious and ambitious will take any employment offered even at extortionate charges rather than accept public relief. These considerations render maximum charges a reasonable regulation. No claim is made that the charges provided are unreasonable or unfair for the service rendered. Inability to regulate through a maximum charge may circumvent, or render ineffectual, the power to maintain a minimum wage, and thus endanger the right of the applicant to obtain a living wage.

In the expression of our views we have placed reliance not alone upon principles expressed by the majority in decisions, but also upon many expressed by distinguished jurists in dissent. We might appropriately quote at length from both. We feel that they may be read with more profit in their original context and setting. However, the final observations we intended to make are so clearly and concisely stated by others that we adopt their langauge to express our thoughts.

" The powerful dissents in *Adams* v. *Tanner* (244 U. S. 590); *Tyson* v. *Banton* (273 U. S. 418); *Ribnik* v. *McBride* (277 U. S. 350), and the narrow margin by which the views of the majority prevailed, warn us that the doctrines of those cases are not likely to extend beyond the precise facts presented." (*National Employment Exchange* v. *Geraghty,* 60 F. [2d] 918, HAND, J.)

" ' No evils arising from such legislation could be more far-reaching than those that might come to our system of government if the judiciary, abandoning the sphere assigned to it by the fundamental law, should enter the domain of legislation, and upon grounds merely of justice or reason or wisdom annul statutes that had received the sanction of the people's representatives. We are reminded by counsel that it is the solemn duty of the courts in cases before them to guard the constitutional rights of the citizen against merely arbitrary power. That is unquestionably true. But it is equally true — indeed, the public interests imperatively demand — that legislative enactments should be recognized and enforced by the courts as embodying the will of the people, unless they are plainly and palpably, beyond all question, in violation of the fundamental law of the Constitution.' (*Atkin* v. *Kansas,* 191 U. S. 207, 223.) " (*Lochner* v. *New York,* 198 id. 45, at p. 74.)

Our conclusion is that the provisions of section 185 do not violate the due process clause of the Federal Constitution.

The judgment below is reversed, with thirty dollars costs, and judgment directed for the defendant, with costs. Appeal from order dismissed.

All concur. Present — HAMMER, SHIENTAG and NOONAN, JJ.